Peck, J.,
dissenting:
I do not concur in the above opinion, and I especially dissent from the statement of fact on which it is based. The whole opinion is simply an argument to prove the correctness of that statement, and is to my mind illogical and bad.
In clause third of the “ statement,” it is said, “ On the 22d day of June, 1863, by an order of the Quartermaster General,, the rate of hire of the Maple Leaf was reduced,” &c. I object to this statement. I do not think the Quartermaster General had the power, “ by his order,” to reduce the rates. He could discharge the vessel: he could not reduce the rates without the assent of the owners. He cannot control both sides of a contract. As the representative of the government he may act for it, but he cannot also act for the opposite parties; their rights are beyond his control.
The fourth clause of the same “ statement” asserts that “ the reduction in the rate of hire of said steamer was made with the assent of her owners, and the said second charter-party, dated August 19,1863, was made voluntarily by them. To this assertion I also object. The evidence in the case not only, to my mind, does not sustain it, but is inconsistent with it. The whole opinion is simply a statement of the reasons for arriving at this conclusion;
I shall, therefore, first consider those reasons; and I shall then endeavor to show that even if they were sufficient, and if the second charter-party was voluntarily made by the claimant, still, notwithstanding that fact, he is entitled to recover in this suit.
The fifth clause asserts that “ the said owners have been fully paid,” &'c. This is the very point in controversy. I do not think they have been fully paid, and I object to the insertion *208 in the statement of fact of a conclusion to which I do not agree, and which, if inserted, precludes the claimants from any appeal to a higher tribunal.
The opinion proper begins with the statement that “ the record shows that, on the 19th November, 1862, the Maple Leaf, then at Fort Monroe, was ordered to report to Captain McKim, at Boston, to be discharged, unless otherwise ordered by him.” The only evidence in the record to that effect is a letter from Colonel Thomas to Captain McKim, dated June 10, 1863, more than six months after the order was said to have been issued. There is no proof that either the captain of the vessel or her owners ever received such an order, but it is abundantly proven that the steamer was all the time in the service of the government, and that she faithfully performed her duties under the direction of its proper officers. Even if the order for her discharge had been issued, it would not affect the right to her hire up to the time when she was actually discharged. She performed the service, and is entitled to her pay.
The letter above referred to is also made to do further duty as showing that notice was given of an intention on the part of the government to reduce the rates of the vessel; and a letter of the'claimant of June 15, referring to the above, is cited to show that the claimant knew of such intention. This letter of June 10 speaks generally of a reduction, but makes no specific statement of what or how much reduction is desired.
In reply, Mr. Spear, as agent for the owners, states that at the time the steamer was chartered the rate was not high, but that he is willing to make an “ equitable arrangement.” The first statement as to what reduction was demanded is in the letter of the quartermaster. Clary, of June 22, 1863. Until that time there had been no specific proposition which the claimant could either accept or reject. This proposition he did not think a an equitable arrangement,” and did not accept.
But the question whether claimant knew that it was decided to reduce the rates of his vessel is not material. So long as his steamer was retained in the service he was entitled to her hire at the rates which were stipulated in her charter, unless he had previously consented to change them. The material point is as to his assent to the change. If he voluntarily assented to the change, he is bound by it, but he is not bound by any at *209 tempted reduction by the quartermaster, unless he consented thereto.
The evidence of Mr. Getty shows that the reduction desired by the government was not voluntarily assented to by the claimant. He was presented with a new charter-party, prepared by direction of the Quartermaster General, and was told that he must sign it before any money would be paid him; that “ the government was not suffering if claimant was;” that unless he complied with the terms proposed, he would “ be kept out of his money perhaps for years.”
No compromise was permitted and no representations of the injustice of a course so unusual and arbitrary were listened to. He must sign or his money would be withheld. To rebut this testimony the evidence of Colonel Clary is offered, in which he proves that a general order had previously been issued by the Quartermaster General in reference to charter-parties, and then states generally what had been the practice under that order. He does not swear particularly as to the case in controversy, but states the general course of action.
Under this evidence, the court find that the second charter-party was voluntarily executed. I thiulc it was forced upon the claimant. I think that evidence of general rules, and of general practice under them, is not sufficient to rebut proof of a particular act in a special case. General orders are not always obeyed; and although this court is not very familiar with proceedings before courts-martial, still there is reason to believe that there would be fewer military trials than there are, if military orders were invariably followed by implicit obedience.
But besides these general considerations, the cases which have already been brought here for adjudication have furnished us with opportunities of knowing something about the practice under this order of the Quartermaster General, and we can, ourselves, decide whether, as was stated by Colonel Clary, “ the consent of the owners was obtained in all cases.” Our records are full of evidence to contradict him. I feel constrained, therefore, notwithstanding my respect for my associates, to protest against accepting the opinions of an officer as to the practice under, or the effect of, a general order, especially when his own standing might be affected by his statement, and allow that opinion to override the direct, evidence to the contrary of an unimpeached and disinterested witn ess. I am, therefore, forced *210 to the conclusion that the second charter-party is not binding upon the claimant; that it was exacted under duress, and is void.
In the Reeside Oase (2 Court of Claims, page 58) it is said, “ to make an agreement of compromise effectual, it must be fair, open, and free from undue influence, oppression, and extortion. The parties must stand upon equal ground.” And again on page 59, same case, “It was at one time maintained that duress of the person was necessary to avoid an agreement, and that duress or detention of goods could not have that effect. That doctrine is now exploded.” In support of this statement, Chief Justice Casey refers to Wheeler v. Smith, (9 How. p. 55.) On page 61, it is said, To present to a man the alternative of paying an extortionate sum, or of reUnqtdsldng a legal right on the one hand, or be deprived of the rightful possession of his property, or obtain it through the delay, vexation, and expense of a lawsuit on the other, the law holds to be unconscionable and unlawful, and renders every promise and agreement extorted in that way wholly null and void.” Judge Loring, in the conclusion of his opinion in the case of Theodore Adams, (page 70 of the same volume,) affirms the same doctrine. In the case of Ramsdell and Smith, (page 508, same volume,) Judge Loring, delivering the opinion of the court, again affirmed this doctrine and stated: “ Then it was plain that this suit was barred by Mr. Smith’s proposal to take $11 per gun, and the payment of that price to him; but that was at the most an agreement to take a part of the debt for the whole, when the whole was due, and as nudum pactum is of no legal obligation; moreover the officers and agents of the War Department refused that adjudication of Mr. Smith’s claim to which he was entitled, and thus in fact enforced from him the proposal he made as his only means of obtaining any part of the money due him, which he needed to meet his engagement for the guns, and this is legal duress which voided the transaction made under it.” This claimant needed money quite as much as Mr. Smith, and an examination of the facts in all the cases above cited, and a comparison of them with the proofs in this case, show that no greater force or compulsion was used against any of those parties than that to .which this claimant was subjected. If it was duress then, it is no less so now.- I therefore think that this claimant is not bound by the terms- of the charter-party which he was forced *211 to sign, so far as they affect the price for his steamer for the time previous to the elate when it was actually executed. I think that from June 22d to August 19th, he is entitled to the full hire of his vessel, as fixed in his first charter.
Great stress is laid in the opinion on the fact that the claimant made no particular request for the discharge of the vessel. Why should he? He was under no obligation to do so.. His contract stood until the vessel was discharged, unless he in the mean time made a new agreement. He had made his charter-party, and his price was fixed, with the assent of the government, “ for so long a time as the vessel should be employed.” All that he asked was his stipulated price. This is all he now asks. I think him entitled to it. The defendants could discharge the rrnssel at pleasure; the claimant could not withdraw her from service; Like almost all contracts with the defendants, it was one-sided in that regard, and submission or punishment was inevitable to the claimants.
But there is another branch of the subject on which I desire to say a fe w words. The Maple Leaf it is conceded performed the services required of her for the ichole time for wldeh compensation is now claimed; she was paid, in accordance with her charter, at $550 per day, only till April 22, 1863.
On the 22d day of June, 1863, a quartermaster, assuming to act for the Quartermaster General, by what authority does not appear, ordered that her rates should be reduced to $300 per day, to take effect, not at the date of the order, but on the 22d day of April, sixty days previous. The service had been already performed. No notice had been given. The first intimation that any reduction was contemplated was contained in the letter of June 10,1863, from Colonel Thomas to Captain McKim, and this did not state what or how great a reduction was desired. I am unable to see by what course of reasoning this action of the Quartermaster General is sustained. Instructions from the Quartermaster General to his assistants, or correspondence between the latter, I do not regard as evidence sufficient to bind a civilian, in no Avay cognizant of or directly connected with them. In the management of public affairs within the line of their duties the' officers might be held amenable to those in authority for omission or neglect, but not to the citizen; he would be powerless in the premises. The second charter-party, even if valid, only purports to affect the *212 price after June 22. There is not a particle of evidence that claimant ever consented to any reduction previous to that date, unless the fact that he signed various receipts for portions of the hire of his vessel, which contained the words “ in full of the above account,” is held to be sufficient to bind him to the reduction. This point is not mentioned in the opinion of the court, and I should not now consider it if I could see any other grounds for this portion of the decision. The rule as to the effect of receipts in the form used in this case has been very fully discussed by the court in other cases, and the decision that, when given for a portion of the debt, they do not preclude the creditor from a further recovery, is, in my opinion, correct and well sustained.
I think the claimant should also recover the balance withheld from him, from April 22 to June 22, in addition to the balance due him from June 22 to August 19. The second charter-party, if voluntarily executed, might account for the reduction after June 22, the date at which by its terms it was to take effect, but there is nothing to show any assent or agreement'by the claimant to this arbitrary reduction for the time which had already elapsed, when the order of the Quartermaster General was issued.
There is no pretense even of a new contract which covers that time, and unless the Quartermaster General can do what no other power in the state is permitted to do, impair the obligations of contracts at pleasure, the claimant is entitled to recover.
With regard to the acceptance of part payments on these charter-parties, under the precise circumstances shown by the record, I may even concede that they were accepted at the-time in payment, and yet the claimants may recover the whole ■amount due, previous to the giving of the receipts, and not included in them.
Metcalf, in his work on contracts, thus states the law, see page 191: “A promise to take a less sum, in satisfaction of a greater, where the greater sum is fixed and liquidated, or is ■ascertainable by merely arithmetical calculation,” (as in the case now under discussion,) “is without consideration and void; and after talcing it and, agreeing to discharge the debtor, the creditor may recover the balance;” and refers to the following reported cases as sustaining the rule: (1st Si,range, 426; 2d Term Bep’ts, *213 124; 5 East., 232; 2d John., 450; 25th Vermont, 386; 2d Hall, 185; 15tb Alabama, 700; 12th Gray, 341; 5th Wharton, 319; 1 Zab., 391. See also page 279 of Metcalf.)
The inference against a claimant that be conseuts to relinquish bis demand, because be does not bring suit at every refusal of the defendants to pay what they justly owe him under a written contract, seems to me contrary not only to public policy, but also against all authority. He has the right to sue at any time within six years, and no presumption arises against him because he prefers to wait and bring one suit, rather than bring several suits, where one should answer every purpose. Suppose he had sued, my observation convinces me that the quartermaster would not have been notified of the fact, or changed his conduct. No good could or would have resulted to the defendants had suit been brought daily. None of the departments pay any regard to proceedings instituted here. It would not be far from, the truth, should I say, that until after judgment they habitually disregard all proceedings in the Court of Claims. This fact is shown by the opinions of this court in several cases, and more especially in that of Stow v. The United States, recently decided.
I regret.as much as any one the conduct pursued by the Quartermaster’s Department, toward claimants, about these charter-parties. The whole proceeding of that department toward this claimant and others, as I think, was in violation of law. It would seem from the many and repeated notices and objections by this and other claimants, that advice should have been sought from the law officers of the government as to the legality of their action. If the defendants should be made to suffer for the wanton wrong of its officers in disregarding the obligation of contracts, it is their fault, and not the fault of the law.
I would gladly retrieve the errors of the quartermaster, if possible, but it is no part of my duty to favor injustice, or to omit to declare the law as I understand it. I should dishonor my position by so doing, and I have not been placed here by the United States for any such purpose. That would dishonor the- government. This court was established, as I. believe, that justice might be done, and the law administered with an equal balance between the state and the citizen. The quartermasters have misconducted, and the government should bear the loss *214 resulting from that misconduct. The citizen makes his bargain with a view to profit, and when he makes it with fairness he should be protected. In this case there is no pretence even of unfairness, and not a syllable of evidence to show, any exorbit-ancy of price. If the defendants could have made better bargains than these for the charter of vessels, they should have done so. This claimant had no power to coerce the defendants or to extort from them. The defendants -would neither discharge the vessels nor pay the price agreed upon for their use, but compelled this and other claimants to continue their vessels in the service, and expected them to be satisfied with whatever compensation might be offered them.
Whether the defendants could or could not have made better contracts is not important. These are the bargains they did voluntarily make, and they are bound by them.' My duty is simple and plain. It is to enforce the existing contract, which establishes and settles the law as between the parties to it, so recognized by universal precedent and common consent.